J-A26028-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| SHARIF SALAH BROWN | : | |
| | : | |
| Appellant | : | No. 2897 EDA 2019 |

Appeal from the Judgment of Sentence Entered September 10, 2019
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s): CP-39-CR-0004051-2018

BEFORE:   BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED DECEMBER 14, 2020**

Sharif Salah Brown appeals from the judgment of sentence, entered in the Court of Common Pleas of Lehigh County, after he was convicted by a jury of one count each of possession with intent to deliver (PWID) a controlled substance—cocaine,[1] possession of a controlled substance—cocaine,[2] possession of drug paraphernalia,[3] and possession of a small amount of marijuana.[4]  After careful review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(30).

[2] 35 P.S. § 780-113(a)(16).

[3] 35 P.S. § 780-113(a)(32).

[4] 35 P.S. § 780-113(a)(31).

At approximately 2:00 p.m. on July 25, 2018, plain-clothed Detective Evan Weaver of Allentown Police Department was conducting surveillance on the 500 block of Pioneer Street in an unmarked vehicle. N.T. Suppression Hearing, 12/17/18, at 8-9. Detective Weaver, an FBI task-force officer, was surveilling a window tint and audio shop after having been told by "cooperating individuals" that marijuana was being sold out of the garage. *Id.* at 8-10. Detective Weaver, assigned to the Vice and Intelligence Unit since 2001, classified the area as a "high drug area." *Id.* at 10. Detective Weaver had conducted prior investigations and made arrests in that vicinity. *Id.* Detective Weaver observed an "orangish-color" BMW arrive at the garage and park on Pioneer Street. *Id.* The car's driver and sole occupant exited the car with nothing in his hands, entered the garage, and exited the garage less than one minute later holding "a small object." *Id.* at 10-11. The driver then reentered the BMW and pulled out into traffic. *Id.* at 11. Detective Weaver subsequently identified Brown as the driver of the BMW. *Id.*

Detective Weaver followed the BMW as it proceeded south on Pioneer Street and then westbound to Liberty Street. *Id.* As the BMW headed south on 9th Street, Detective Weaver observed the car drive through a steady red light at the intersection of 9th and Chew Streets. *Id.* At that moment, Detective Weaver called for a marked police unit to stop the vehicle for the traffic infraction. *Id.* at 12. Uniformed Police Officer Talden Cashatt responded to the detective's request and effectuated a traffic stop of the BMW

at the 1000 block of Linden Street. *Id.* at 13.[5] Brown immediately pulled over and parked the BMW. *Id.* Officer Cashatt approached the driver's side of the vehicle and asked Brown for his license and registration. *Id.* at 40-41. Brown handed the officer his Pennsylvania Driver's license and registration. *Id.* at 41.

Detective Weaver observed Officer Cashatt pull over the BMW; the detective parked his own unmarked car approximately 200 feet away in an open parking spot. *Id.* Detective Weaver and two other detectives then approached the driver's side of the BMW as Office Cashatt returned to his marked patrol car with Brown's license and registration. *Id.* at 13-14, 40. Detective Weaver, with his badge around his neck, identified himself to Brown as a member of the Vice Unit, and spoke with him briefly. *Id.* at 13-14. At that point, Detective Weaver testified that he "immediately observed a change in [Brown's] demeanor. He became very nervous. He began sweating profusely." *Id.* at 13. Detective Weaver then asked Brown to step out of the car and move to the rear of the vehicle "so [he] could talk to him." *Id.* Brown complied, exited the BMW, and walked to the back of the vehicle. *Id.* at 15. Detective Weaver said Brown was very "cordial" and "nice" as they talked[6] at

_____

[5] Officer Cashatt testified that he kept in constant contact with Detective Weaver when he was effectuating the traffic stop, receiving updated locations of the BMW from the detective. N.T. Suppression Hearing, 12/17/18, at 39.

[6] Detective Weaver testified that he asked Brown "where he had come from [so that he could] see if [Brown] was going to be truthful [and] tell[ him] he stopped at the garage." *Id.* at 15-16.

the back of the BMW. *Id.* Moments after Brown exited the car and walked to the back of the vehicle, Officer Cashatt notified Detective Weaver that there were drugs, in plain view, inside Brown's vehicle. *Id.* at 15-16. Officer Cashatt testified that, based on his training and experience, the item on the car's floorboard, in plain view, appeared to be a bag of marijuana. *Id.* Officers subsequently conducted a search of the interior of the BMW. *Id.* at 42-43. Pursuant to that search, Officer Cashatt discovered more suspected narcotics, later determined to be powder and crack cocaine, in the vehicle's center console. *Id.* at 43.[7]

Brown was handcuffed, placed in Officer Cashatt's marked patrol vehicle, and taken to the police station.[8] *Id.* at 16. At the station, Brown signed a *Miranda*[9] waiver and agreed to speak with Detective Weaver and Allentown Police Detective Brian Murray. Brown admitted that he had purchased the cocaine found in the center console and intended to sell it. He

---

[7] The items found in the center console included two knotted bags containing powder cocaine, one knotted bag that contained crack cocaine, and two smaller bags that contained crack cocaine, with a total weight of approximately 8 grams. *Id.* at 44.

[8] In exchange for his agreement to cooperate with law enforcement, Brown was not cited for the offenses on the day of the stop. *Id.* After several unsuccessful attempts to reach Brown following his release on the date of the stop, Detective Brian Murray filed a warrant on the above-referenced drug charges. *Id.*

[9] *Miranda v. Arizona*, 384 U.S. 436 (1966).

further admitted that he attempted to convert the powder cocaine into crack cocaine, but was unable to do so because of the poor quality of the product.

Brown was arrested on August 21, 2018, and charged with the above-stated offenses. On November 14, 2018, Brown filed a pre-trial motion to suppress all of the items seized from his person and vehicle, as well as any statements that he made to law enforcement officials on the day of the vehicle stop. In the motion, Brown alleged that the officers had no legal justification to stop his vehicle, detain him after his car was stopped, or search his vehicle and seize him. He further argued that because the search and seizure was unconstitutional, any statements he made to investigating officers when he was questioned at the station following the stop were the "fruit of the poisonous tree" and should be suppressed.

On December 17, 2018, the court held a suppression hearing where Detective Weaver, Officer Cashatt and Detective Murray testified. At the conclusion of the suppression hearing, the court asked defense counsel whether he wished to make argument or submit a memo on the suppression issues. *Id.* at 55.[10] Counsel stated that he wished to submit a memorandum

_____

[10] We recognize, however, that under Pennsylvania Rule of Criminal Procedure 518 (I):

> At the conclusion of the hearing, the judge shall enter on the record a statement of findings of fact and conclusions of law as to whether the evidence was obtained in violation of the defendant's rights, or in violation of these rules or any statute, and shall make an order granting or denying the relief sought.

of law. *Id.* Counsel submitted a memo on January 29, 2019; on February 8, 2019, the Commonwealth filed a brief in opposition. The court denied the suppression motion on February 13, 2019. In its opinion accompanying the order denying suppression, the court found that even though Detective Weaver's stop was pretextual, because he also observed a violation of the Motor Vehicle Code (MVC), he legally stopped Brown's car. Trial Court Pre-Trial Suppression Opinion, 2/13/19, at 3. The court further concluded that it was of no moment that the detective did not cite Brown for a MVC violation where such a decision is within the officers' discretion. *Id.* at 4. Finally, the court found that Detective Weaver was permitted to request that Brown exit his car during a lawful traffic stop. *Id.* at 5. In its summation, the court stated:

> Accordingly, the stop of the vehicle was lawful, the marijuana observed by Officer Cashatt was in plain view, Officer Cashatt's observations of the marijuana established probable cause to search the vehicle, and it was lawful to require [Brown] to alight from the vehicle. In light of the propriety of the search, the statements made by [Brown] were not "fruit of the poisonous tree."

*Id.*; *see also* Trial Court Rule 1925(a) Opinion, 2/3/20, at 8 (same).

After a jury trial, Brown was convicted of all charges. The court ordered a presentence investigation report and mental health evaluation. On

---

Pa.R.Crim.P. 508(I).

- 6 -

September 10, 2019, the trial court sentenced Brown to 30-84 months' imprisonment for PWID and ordered him to pay the costs of prosecution on all other counts. Brown was deemed eligible to participate in the Risk Recidivism Reduction Incentive (RRRI) program.[11] Brown filed a timely notice of appeal[12] and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On appeal, Brown presents the following issue for our consideration: "Whether the police, in stopping [Brown's] vehicle and confronting [him], had a lawful basis for doing so and whether or not the lower court erred in denying [Brown's] request to have the arrest, questioning[, and] search of the vehicle suppressed?" Appellant's Brief, at 7.

Our standard of review on appeal of the denial of a motion to suppress is to determine whether the certified record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from those findings. *Commonwealth v. Gould*, 187 A.3d 927, 934 (Pa. Super. 2018). We consider only the evidence of the prosecution's witnesses and so much of the defense's evidence as, fairly read in the context of the record as a whole, remains uncontradicted. *Id.* If the record supports the factual findings of the suppression court, we will reverse only if there is an error in the legal conclusions drawn from those factual findings. *Id.*

---

[11] *See* 61 Pa.C.S. §§ 4504-4505.

[12] On October 8, 2019, trial counsel moved to withdraw. On October 28, 2019, the court granted counsel's request and appointed counsel for appeal, Joseph Todd Schultz, Esquire.

Where a traffic stop is "based on the observed violation of the Vehicle Code or [an] otherwise non-investigable offense, an officer must have probable cause to make a constitutional vehicle stop. [A] police officer has probable cause to stop a motor vehicle if the officer observes a traffic code violation, even if it is a minor offense." *Commonwealth v. Gurung*, -- A.3d --, 2020 PA Super 226 at *6 (Pa. Super. 2020) (citations omitted). During a stop, an officer has the right to check the vehicle registration, the driver's license, and any other information required to enforce the MVC. *Commonwealth v. Mack*, 953 A.2d 587, 589 (Pa. Super. 2008). Moreover, police may request a driver to alight from a lawfully stopped car, as a matter of right, without reasonable suspicion that criminal activity is afoot. *Pennsylvania v Mimms*, 434 U.S. 106 (1977); *Commonwealth v. Brown*, 654 A.2d 1096, 1102 (Pa. Super. 1995). *See Commonwealth v. Pratt*, 930 A.2d 561, 567-68 (Pa. Super. 2007) ("[A]llowing police officers to control all movement in a traffic encounter . . . is a reasonable and justifiable step towards protecting their safety."). Finally, our United States Supreme Court has held that any violation of the MVC, even a minor violation, "legitimizes a stop, even if the stop is merely a pretext for an investigation of some other crime." *Commonwealth v. Harris*, 176 A.3d 1009, 1020 (Pa. Super. 2017) (despite officer's subjective motive (i.e., pretext) to stop defendant's vehicle to investigate potential drug crimes, uncontradicted evidence that defendant violated MVC gave officer probable cause to stop vehicle, ask defendant questions, and ask him to exit vehicle; based on totality of circumstances,

officer had reasonable suspicion to detain defendant and conduct K-9 sniff of exterior of vehicle after initial traffic stop).[13]

Here, Officer Cashatt acted lawfully in conducting a vehicle stop of Brown's BMW after Detective Weaver observed Brown drive through a steady red traffic light, in violation section 3112(a)(3) of the MVC. **See** 75 Pa.C.S. § 3112(a)(3).[14] Detective Weaver was also permitted to ask Brown to step out of the car, even in the absence of any particularized suspicion of criminal activity during the stop.[15] **Mimms**, **supra** at 111 ("What is at most a mere

---

[13] To the extent that Brown argues the police were required to charge him with an MVC violation, in **Commonwealth v. Snell**, 811 A.2d 581 (Pa. Super. 2002), we pointed out that the issuance of a citation by an officer for a violation of the MVC is a matter within the sole discretion of that officer. **Id.** at 584. **See Commonwealth v. Spieler**, 887 A.2d 1271 (Pa. Super. 2005) (even though officer stopped car for suspected MVC violations and only arrested defendant for DUI, stop proper because officer articulated sufficiently specific facts for probable cause that defendant had violated MVC).

[14] While the trial court did not explicitly state that it found Detective Weaver's testimony credible on this point, it essentially verified his credibility when it stated that "[t]he uncontradicted testimony of Detective Weaver demonstrates a Vehicle Code transgression, and probable cause to stop the vehicle was established." Trial Court Pre-Trial Suppression Opinion, 2/13/19, at 4.

[15] Although not legally necessary, **see Mimms**, **supra**, Brown's sudden change in behavior, once Detective Weaver identified himself as a member of the vice squad, certainly raised the detective's suspicion that criminal activity may be afoot. Moreover, where Officer Cashatt had not yet returned Brown's license and registration to him and told him he was free to leave, this is not a situation where we have either an impermissible extension of an initial valid stop or an illegal detention that would require reasonable suspicion or probable cause. **Cf. Commonwealth v. Dales**, 820 A.2d 807 (Pa. Super. 2003) (when purpose of initial, valid traffic stop has concluded and reasonable

inconvenience [to a driver who is asked to step out of his or her car during a traffic stop] cannot prevail when balanced against legitimate concerns for the officer's safety). *Commonwealth v. Freeman*, 757 A.3d 903, 907 n.4 (Pa. 2000) (following lawful traffic stop, officer may order both driver and passengers of vehicle to exit vehicle for duration of initial stop, even absent reasonable suspicion that criminal activity is afoot). Just moments after Brown exited and walked to the back of his vehicle, Officer Cashatt observed drugs in plain view on the driver's side floor of the BMW. N.T. Suppression Hearing, 12/17/18, at 42 (Officer Cashatt testified that "as soon as [Brown] stepped out of the vehicle and started walking toward the back [of the car], in plain view on the driver's side on the floor board was a clear plastic bagg[ie] containing green vegetable matter that is common with the appearance of marijuana."); *id.* at 16 (Detective Weaver testified that "[I]t was relatively quick when they located the drugs."). *See also id.* at 30 (Detective testifying at suppression hearing that "[i]t was very early on [in the stop] when [I] first spoke [] with Brown.").

Instantly, the trial court found that Officer Cashatt had probable cause to conduct a warrantless search of the interior of Brown's vehicle once he observed the marijuana in plain view on the floor of the BMW. *See* Trial Court

---

person would not have believed he was free to leave, subsequent round of questioning by police not supported by reasonable suspicion or probable cause is unlawful detention; even consensual search is illegal where preceded by unlawful detention unless Commonwealth proves sufficient break in causal chain between illegality and seizure of evidence).

Pre-Trial Suppression Opinion, 2/13/19, at 2, 5; Trial Court Rule 1925(a) Opinion, 2/3/20, at 8. In **Horton v. California**, 496 U.S. 128 (1990), the United States Supreme Court adopted a three-pronged test for application of the plain view doctrine: (1) the police must observe the object from a lawful vantage-point; (2) the incriminating character of the object must be immediately apparent; and (3) the police must have a lawful right of access to the object. **Id.** at 136-37. The Pennsylvania Supreme Court adopted this three-pronged test in two subsequent cases, **Commonwealth v. McCullum**, 602 A.2d 313, 320 (Pa. 1992), and **Commonwealth v. Graham**, 721 A.2d 1075, 1079 (Pa. 1998). In **Commonwealth v. Brown**, 23 A.3d 544 (Pa. Super. 2011), our Court defined what the phrase lawful right of access to an object means under the plain view doctrine, stating "where police officers observe incriminating-looking contraband in plain view in a vehicle from a lawful vantage-point, the lack of advance notice and opportunity to obtain a warrant provides the officer with a lawful right of access to seize the object." **Id.** at 556-67.

Here, Officer Cashatt observed the substance of the clear baggie on the floor of the BMW from a lawful vantage point—a public street. Moreover, based on the officer's professional experience, he believed that the green vegetable-like matter was marijuana. Finally, because the officer was in the process of conducting a lawful traffic stop and it was not reasonably practicable to expect him to obtain a warrant prior to seizing the contraband, he had a lawful right of access to the object. **Brown**, **supra**. Thus, we find

- 11 -

that the plain view doctrine applies and that Officer Cashatt had probable cause to seize the suspected marijuana he saw on the driver's side floor board of Brown's vehicle.

We also conclude, based on a totality of the circumstances, that Officer Cashatt had probable cause to conduct a warrantless search of the interior of Brown's vehicle and seize the contraband found therein.[16] In *Commonwealth v. Luv*, 735 A.2d 87 (Pa. 1999), our Supreme Court stated:

> Probable cause exists where the facts and circumstances within the officers' knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed. With respect to probable cause, this [C]ourt adopted a "totality of the circumstances" analysis [which] . . . dictates that we consider all relevant facts, when deciding whether [the officer had] probable cause.

*Id.* at 90 (citations omitted). Here, the following additional factors contributed to the finding of probable cause to search Brown's vehicle following Officer Cashatt's plain view of marijuana on the car's floor: (1) the fact that Detective Weaver had just seen Brown, immediately prior to the lawful traffic stop, enter and quickly exit a garage that was being surveilled as the subject of a narcotics investigation, with a small object in his hand; (2) Brown's drastic change in

___

[16] Although not specifically raised on appeal, we note that Officer Cashatt was permitted to search the center console of the vehicle. If police have the requisite probable cause to search a vehicle for contraband, they are permitted to search the passenger compartment where the contraband in question could be concealed, such as a center console. *See Commonwealth v. Scott*, 210 A.3d 359 (Pa. Super. 2019).

demeanor (nervousness and profuse sweating) upon Detective Weaver identifying himself at the initiation of the stop; (3) the fact that the stop occurred in a high-crime area;[17] (4) Officer Cashatt's 11 years of experience on the police force during which he has made numerous arrests for marijuana; and (5) Detective Weaver's more than 6½ years of narcotics experience and position on the FBI task-force. **See Scott**, **supra** (where officer smelled odor of burnt marijuana and saw small amount of contraband in plain view in vehicle, probable cause existed to search passenger compartment, not trunk, of vehicle); **Commonwealth v. Runyan**, 160 A.3d 831 (Pa. Super. 2017) (police officer had probable cause to conduct warrantless search of vehicle after detecting odor of burnt marijuana coming from vehicle's area, observing what appeared to be small bag of marijuana on back seat passenger side floor, and noticing driver's furtive behavior when police brought bag of marijuana to attention of car's occupants). **See also Commonwealth v. Gary**, 91 A.3d 102, 138 (Pa. 2014) (plurality) ("The prerequisite for a warrantless search of a motor vehicle is probable cause to search; no exigency beyond the inherent mobility of a motor vehicle is required."); **Commonwealth v. McCree**, (Pa. 2007) (probable cause to search interior of vehicle existed based on limited

---

[17] **But see Commonwealth v. Barr**, -- A.3d --, 2020 PA Super 236, at *57 (Pa. Super. 2020) (Strassburger, J., concurring) ("I write separately to note my discontent with the Commonwealth's reliance on the "high-crime area" factor in support of a finding of probable cause. I believe that the status of the neighborhood at issue as a "high-crime area" should not be relevant to the probable cause determination. People who live in poor areas that are riddled with crime do not have fewer constitutional rights than people who have the means to live in "nice" neighborhoods.").

automobile exception where, under totality of circumstances, officer observed pill bottle in plain view in vehicle stopped in area well-known for illegal prescription drug sales, officer was aware of other officer's pre-planned drug buy with passenger in defendant's vehicle, and there was no advanced warning that defendant or his car would be target of police investigation).

Having found probable cause existed to conduct a search of the interior of Brown's vehicle, the search and seizure were legal in the instant case, and thus, any subsequent statements Brown made to detectives after being **Mirandized** were not "fruit of the poisonous tree." **See Commonwealth v. Shabezz**, 166 A.3d 278, 287 (Pa. 2017) (holding that evidence derived from *illegal* automobile search constitutes fruit of poisonous tree as result of illegal seizure).

Judgment of sentence affirmed.[18]

_____

[18] We recognize our Court's recent decision, **Barr**, **supra**, where we addressed whether the odor of marijuana alone *per se* establishes probable cause to conduct a warrantless search of a vehicle (known as the "plain smell" doctrine). There, our Court found that "[w]hile the odor of marijuana *may* contribute to a finding of probable cause, as possession of marijuana remains illegal generally, the *odor alone* does not imply individualized suspicion of criminal activity." **Id.** at *51 (emphasis added). Our Court discussed factors that a trial court should consider, in addition to the odor of burnt marijuana, which could support a finding of probable cause. **See id.** at *49-51.

**Barr** noted that the plain smell doctrine, which was premised upon "the previously universal fact of marijuana's illegality and its distinctive odor[,]" **id.** at *25, "has necessarily been diminished by the M[edical] M[arijuana] A[ct] in Pennsylvania." **Id.** at *26. The Medical Marijuana Act (the Act), 35 P.S. §§ 10231.1101-10231.2110, is "a temporary measure, pending Federal

_____

approval of and access to medical marijuana through traditional medical and pharmaceutical avenues." **See** 35 P.S. § 10231.102(4). The Pennsylvania Department of Health (DOH) administers and enforces the Act, which was approved on April 18, 2016, **see** Act 2016-16 (S.B. 3), § 102, and became effective on May 18, 2016. Section 10231.303 of the Act allows for the limited lawful use of medical marijuana. In its May 2020 report, the DOH noted that, as a result of the Medical Marijuana Advisory Board's recommendation in the final report authorized by the Act, "**dry leaf or plant form for administration by vaporization became an acceptable form of medical marijuana for Pennsylvania patients effective May 17, 2018**." PA Department of Health Two-Year Final Report, 5/15/20, at 2 (emphasis added). "Dry leaf was made available for purchase by certified patients and approved caregivers in permitted dispensaries in August 2018." **Id.** A "dispensary" is defined under the Act as "[a] person, including a natural person, corporation, partnership, association, trust or other entity, or any combination thereof, which holds a permit issued by the [DOH] to dispense medical marijuana. **The term does not include a health care medical marijuana organization under Chapter 19**." 35 P.S. § 10231.103 (emphasis added). **See** 35 P.S. § 10231.1901 (defining "Health care medical marijuana organization" as "[a] vertically integrated health system *approved by the department to dispense medical marijuana* or grow and process medical marijuana, or both, in accordance with a research study under this chapter.") (emphasis added). Thus, a dispensary is not the sole means by which a certified patient or approved caregiver could obtain medical marijuana, even prior to August 2018.

However, because we cannot ascertain from the record whether Brown, specifically, could have legally obtained dry leaf marijuana before his vehicle was searched, and where remanding this case for such a determination would not change our result, we do not analyze or discuss the implications of applying **Barr** to the instant facts. Rather, we leave for another day the issue as to whether an officer's observation of a legal form of medical marijuana (such as dry leaf in the instant case) in a clear baggie in plain view during a legal traffic stop *per se* establishes probable cause to conduct a warrantless search of that vehicle.

- 15 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/14/20