OPINION BY McLAUGHLIN, J.:
Appellant Carl Gould was charged with numerous drug-related charges, including three counts of possession with intent to deliver,[1] after State Police executed a search warrant on a car they had observed Gould driving and seized five bundles of heroin and 34 plastic bags of cocaine, as well as documentation linking Gould to the vehicle.[2] The troopers obtained the search warrant based in part on information acquired from a state parole agent, who had previously searched the car. Gould argues that the trial court should have suppressed the heroin and cocaine because the parole agent lacked reasonable suspicion to detain Gould and perform the initial search, and because he was improperly acting at the behest of the State Police. We affirm.
Gould was arrested on August 9, 2015, and charged under two docket numbers, which were consolidated for trial. Before trial, Gould moved to suppress the items recovered following the search of the vehicle. The trial court held a hearing on Gould's motion to suppress on May 17, 2016, at which Agent Robert Clites of the Pennsylvania Board of Probation and Parole ("Board") and Pennsylvania State Trooper Noel Velez testified. Agent Clites and Trooper Velez testified as follows at the suppression hearing.
Agent Clites testified that he received a telephone call on August 7, 2015, from Trooper Velez, who was conducting surveillance of suspected drug activity at the Westfield Inn in East Hempfield Township, Lancaster County. Trooper Velez conveyed to Agent Clites that he had observed Gould at the Inn and that he suspected Gould was involved in the drug activity under investigation. He also gave Agent Clites a description of the car he had seen Gould driving. According to Agent Clites' testimony, Trooper Velez told him that "Mr. Gould showed up in a gray Nissan at that hotel, went inside, came back out. They suspected that he was involved somehow with that drug activity." N.T. Suppression Hearing, 5/17/16, at 45.
Trooper Velez asked Agent Clites if Gould was under supervision by the Board. Agent Clites looked up Gould's information and confirmed that Gould was in fact under supervision, as he was on parole for sentences imposed on several drug-related convictions.[3] Gould's parole officer was *932 Agent George Mann, who was "not available at all that weekend." Id. at 33. Agent Clites reviewed Gould's parole file (including Agent Mann's notes), which indicated that Gould's approved address was in Harrisburg, and that Agent Mann had sanctioned Gould in the past for staying overnight in Lancaster without prior approval. Gould would need the Board's permission in order to change his approved residence from Harrisburg to Lancaster, and Agent Clites found nothing in the file giving Gould permission to stay overnight in Lancaster. Gould could drive to Lancaster, so long as he did not stay overnight. The file included an entry by Agent Mann from three weeks earlier, stating that Gould had a girlfriend in Lancaster with whom he was attempting to cut ties.
In addition to prohibiting him from staying overnight at a place other than his approved residence, the conditions of Gould's release specified that it would be a violation of parole for Gould to possess drugs. Gould's file also contained a form Gould had signed in which he consented to parole officers conducting warrantless searches of his person, property, and residence.
After speaking with Trooper Velez and reviewing the file, Agent Clites called his supervisor, who instructed him to "to see if [Gould] was found at the Westfield Inn, to conduct a search if [Agent Clites] felt that it was appropriate, and to detain [Gould] if [Agent Clites] felt that it was appropriate." Id. at 17. Agent Clites arrived at the Westfield Inn at around 8 p.m., spoke with Trooper Velez, and waited for Gould to return. By approximately 2:30 a.m. that night, Gould had not returned to the hotel, and both Agent Clites and Trooper Velez went home.
The next day, Agent Clites again called his supervisor, who instructed him to "follow up" on the situation. Id. at 18. Agent Clites returned to the Westfield Inn around 4:00 p.m. and waited in his vehicle for Gould.
Gould arrived at the hotel that night at approximately 1:30 a.m., driving a car that matched the Nissan Trooper Velez had described. Agent Clites parked his vehicle behind Gould's, blocking it in. When asked whether he blocked Gould's car so that Gould could not leave, Agent Clites testified, "I wouldn't say that. That was more of a safety issue. I don't know what his response is going to be when I show up at the car. I would prefer that he not step on the gas and back out." Id. at 40.
Agent Clites got out of his car, knocked on Gould's window, identified himself as a parole officer, and asked Gould to get out of his vehicle. Agent Clites testified that "[t]here were other troopers around for backup, just in case anything happened; however, it was just me up to the vehicle." Id. at 20. When Gould opened the door, Agent Clites noticed a very strong odor of burnt marijuana emanating from the car. Agent Clites escorted Gould to the sidewalk of the Westfield Inn.
On the sidewalk, Agent Clites patted Gould down for weapons, and found a large bundle of cash in Gould's pocket. Agent Clites asked Gould for identification; Gould stated that his wallet was in the door of his vehicle, and gave Agent Clites permission to retrieve it. Agent Clites retrieved the wallet from the car door and confirmed Gould's identity with his driver's license.
Agent Clites then questioned Gould about why he was in Lancaster. Gould responded that Agent Mann "knows" Gould goes to Lancaster, and that Gould was only at the Westfield Inn to pick someone up. Id. at 23-24. Agent Clites then informed Gould that he was going to search his car. Gould protested that it was *933 a borrowed vehicle and that he did not give consent to search.[4] Agent Clites told Gould "based on what I see, I smell marijuana coming out of your car. I saw in the notes that you have been sanctioned for drug use in the past, that, you know, you were sanctioned in the past for being in Lancaster without permission," and "[b]ased on that information, I'm going to take a look through the car to see what's in there." Id. at 24.
Agent Clites opened the driver's side door, and then the console, where he found one marijuana cigarette and a large plastic bag containing many smaller plastic bags. Agent Clites testified that he concluded, "[b]ased on [his] experience, that was either cocaine or heroin, and there were large quantities of it in there." Id. at 25. Agent Clites stopped his search of the vehicle, and called Trooper Velez to notify him of what he found and that he would be detaining Gould for violating two conditions of his parole: (1) staying at an unregistered address without permission and (2) possessing drugs. Gould was "placed in handcuffs and taken into custody." Id.
On cross-examination, Gould's attorney asked Agent Clites if Trooper Velez asked him to help with the state police investigation. Agent Clites responded that he was aware that Trooper Velez was conducting a drug investigation in the hotel, but that Trooper Velez "didn't necessarily ask [him] to go assist with their investigation." N.T., 5/17/16, at 27. Rather, according to Agent Clites, he asked him "to deal with Mr. Gould from a parole perspective." Id. Agent Clites further explained that he was following up on information about a possible parole violation, as was his duty as a parole agent, and because his supervisor instructed him to do so:
I am not responding to his request. I'm responding to the information that he's provided to me. It's my obligation as a parole agent, when an individual provides information to me about alleged parole violations, it's my obligation to follow up on that. And I did so also at the direction of a supervisor.
N.T., 5/17/16, at 46.
Agent Clites further testified that he went to the Westfield Inn because Trooper Velez suspected that Gould was not residing at his approved residence, and because he (Agent Clites) "suspected if [Gould is] coming to the Westfield [Inn] where there's drug activity, that he may be involved with that." Id. at 28. When Gould's attorney asserted that in addition to a violation of Gould's parole, participation in drug activity "would also be a violation of the Penal Code," Agent Clites responded that that was "not [his] concern." Id. at 31.
Agent Clites arrested Gould, and a State Police drug detection dog performed a sniff test of the exterior of Gould's vehicle. The dog alerted to the presence of controlled substances in the vehicle. State Police then towed the car to the Lancaster barracks.
Trooper Velez then prepared an application for a search warrant for the Nissan. The affidavit of probable cause attached to the application did not mention Agent Clites or his initial search of Gould's car, but only the results of Trooper Velez's investigation of the activity in the hotel and the dog sniff of the car's exterior. Generally, the affidavit alleged that a confidential informant had implicated Gould in the sale of heroin and cocaine. The confidential informant told Trooper Velez that Gould had recently obtained a large quantity of heroin and was using a room at the *934 Westfield Inn to package it for distribution, with help from a woman named Latima Backus.
The affidavit continued: Trooper Velez surveilled the hotel and had observed Gould and Backus entering and exiting. The hotel room under investigation was searched, and it was found to contain heroin and drug-packaging paraphernalia.[5] A second confidential informant told Velez that Gould would be returning to the Inn to pick up the packaged heroin at 1:30 a.m. on August 9, 2015. Gould did return at 1:30 a.m., at which point, according to the affidavit, "Gould was approached in the parking lot and the vehicle was seized." Affidavit of Probable Cause ¶ 24. The affidavit then recounts that a drug detection dog performed a sniff test that indicated the presence of controlled substances.
At the suppression hearing, Gould's attorney asked Trooper Velez why he did not include in the affidavit the information relating to Agent Clites' interactions with Gould that day and his initial search of the car. Trooper Velez answered that he did not include that information as it "wasn't part of [his] investigation." N.T., 5/17/16, at 49.
At the conclusion of the hearing, the court denied the motion to suppress. The trial court held a consolidated bench trial on March 27, 2017, after which it found Gould guilty of three counts of possession with intent to deliver, and one count each of possession of drug paraphernalia and criminal conspiracy.[6] The court later sentenced Gould to an aggregate term of two and a half to seven years' incarceration.
Gould filed a timely notice of appeal, and raises the following issues:
I. Did the trial court err in denying Mr. Gould's Motion to Suppress where state parole Agent Clites lacked the necessary reasonable suspicion to detain and subsequently search Mr. Gould and his vehicle where the agent was acting as a police officer gathering evidence to support new criminal charges?
II. Did the trial court err in denying Mr. Gould's Motion to Suppress where the search warrant for Mr. Gould's vehicle omitted material facts?
Gould's Br. at 5 (answers below omitted).[7]
Our standard of review on appeal of the denial of a motion to suppress is "to determine whether the certified record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from those findings." Commonwealth v. Griffin , 24 A.3d 1037, 1041 (Pa.Super. 2011) (citation omitted). We "consider only the evidence of the prosecution's witnesses and so much of the defense as, fairly read in the context of the record as a whole, remains uncontradicted." Id. If the record supports the factual findings of the suppression court, we reverse "only if there is an error in the legal conclusions drawn from those factual findings." Id.
I. Search by Parole Agent
Gould argues that Agent Clites's detention of Gould and search of his vehicle was unlawful on two bases: (1) Agent Clites lacked reasonable suspicion to conduct the *935 search, and (2) Agent Clites was acting not in his duties as a parole agent, but as an agent of law enforcement. On the first point, Gould argues that Agent Clites lacked reasonable suspicion because "[t]he only information Agent Clites had was that Trooper Velez observed [Gould's] presence at the Westfield Inn the night before." Gould's Br. at 13. On the second point, Gould argues that Agent Clites was "acting as a police officer attempting to gather evidence to support new criminal charges," and therefore required a warrant and probable cause to detain and search. Id. at 12. Gould contends that the police summoned Agent Clites to the Westfield Inn and that Agent Clites assisted the police investigation by immediately detaining, questioning, and searching Gould. We address these arguments in turn.
Reasonable Suspicion
The Fourth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution provide limited protection to those on parole. See Commonwealth v. Williams , 547 Pa. 577, 692 A.2d 1031, 1035-39 (1997). A parole officer need not obtain a warrant based upon probable cause before conducting a search of a parolee. Id. Instead, a parole officer's warrantless search of a parolee "will be deemed reasonable," and the fruits of the search will be admissible in court, "if the totality of the evidence demonstrates: (1) that the parole officer had a reasonable suspicion that the parolee had committed a parole violation, and (2) that the search was reasonably related to the parole officer's duty." Id. at 1036.
Accordingly, pursuant to 61 Pa.C.S.A. § 6153, a state parole agent may conduct a personal or property search of a parolee if there is reasonable suspicion to believe that the parolee "possesses contraband or other evidence of violations of the conditions of supervision." 61 Pa.C.S.A. § 6153(d)(1)(i) and (d)(2). The statute enumerates factors a court may take into account in determining whether reasonable suspicion exists:
(i) The observations of officers.
(ii) Information provided by others.
(iii) The activities of the offender.
(iv) Information provided by the offender.
(v) The experience of the officers with the offender.
(vi) The experience of officers in similar circumstances.
(vii) The prior criminal and supervisory history of the offender.
(viii) The need to verify compliance with the conditions of supervision.
Id. at (d)(6); Commonwealth v. Murray , 174 A.3d 1147, 1156 (Pa.Super. 2017).[8] The statute specifies that in addition to a consideration of the enumerated factors, "reasonable suspicion to search must be determined consistent with constitutional search and seizure provisions as applied by judicial decisions." 61 Pa.C.S.A. § 6153(d)(6).
Reasonable suspicion "exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity." Commonwealth v. Chambers , 55 A.3d 1208, 1215 (Pa.Super. 2012) (citation and brackets omitted). The reasonable suspicion *936 standard is less demanding than probable cause, as "reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause" and "can arise from information that is less reliable than that required to show probable cause." Commonwealth v. Moore , 805 A.2d 616, 620 (Pa.Super. 2002) (quoting Alabama v. White , 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) ).
Parole officers may base reasonable suspicion of drug possession, in violation of parole requirements, on their first-hand observations. For example, in Commonwealth v. Smith , 85 A.3d 530 (Pa.Super. 2014), a parole officer smelled marijuana during a routine walkthrough of a parolee's home. We held that this gave rise to reasonable suspicion, justifying the parole officer's search of the home. Id. at 537.
Parole officers may also base reasonable suspicion of drug possession on information provided by reliable third parties. See Commonwealth v. Altadonna , 817 A.2d 1145, 1152 (Pa.Super. 2003) ("It was not necessary for the parole officers to observe personally [the appellant] engage in illegal activity or suspicious conduct [ (dealing drugs) ] in order for them to form reasonable suspicion. Officers may rely upon information from third parties in order to form reasonable suspicion"). In Williams , the Supreme Court held that a parole agent had reasonable suspicion to search the home of a parolee after receiving a tip from a confidential informant that the parolee was selling drugs, and corroborating that tip with the local police. 692 A.2d at 1033, 1037-38.
Parole officers may likewise form reasonable suspicion that a parolee is staying at a location other than their approved residence based on personal observations and third-party information. See Commonwealth v. Colon , 31 A.3d 309, 315-16 (Pa.Super. 2011) (finding parole agent had reasonable suspicion that parolee was violating his parole in that he was not residing at an approved residence, and upholding the search of his person).
To determine whether a person is "stopped" or "detained" for the purposes of an investigation arising from reasonable suspicion, the court must examine the totality of circumstances and determine whether a reasonable person would have believed he was not free to leave. Commonwealth v. Jones , 874 A.2d 108, 116 (Pa.Super. 2005).
In the instant case, Gould asserts that Agent Clites lacked reasonable suspicion to detain him and search his vehicle, but makes no clear argument as to what point in time his detention began. See Gould's Br. at 11-14. The trial court assessed reasonable suspicion based on the facts leading up to the search of the vehicle, including the observations made by Agent Clites as Gould exited his vehicle, namely, the odor of marijuana. See Trial Ct. Op. at 12.
However, Officer Clites testified that when Gould arrived at the Inn, he parked his car behind Gould's vehicle, blocking it in. Although Agent Clites approached Gould's vehicle alone, state police were in some manner present. Agent Clites then tapped on Gould's window, identified himself as a parole officer, and asked Gould to exit his vehicle. We conclude that on the record presented, Agent Clites detained Gould when Agent Clites blocked Gould's vehicle from moving, identified himself as a parole officer, and asked Gould to exit the vehicle. A reasonable person in Gould's position would not have felt free to leave under such circumstances. See Jones , 874 A.2d at 108, 116 ;
*937 Commonwealth v. Mulholland , 794 A.2d 398, 402 (Pa.Super. 2002) (investigative detention commenced when officer "parked his cruiser in such a fashion as to make it difficult if not impossible for the van to leave the parking lot").[9]
We therefore analyze whether Agent Clites had reasonable suspicion that Gould was in violation of his parole when he parked behind Gould, and we conclude that he did. Agent Clites was entitled to view Trooper Velez as a credible source of information, and his own observations corroborated Trooper Velez's report. Trooper Velez told Agent Clites that Gould had been at the Inn in Lancaster, was under investigation for drug activity, and had been seen driving a gray Nissan. When Agent Clites followed up on this information, he personally observed Gould driving a gray Nissan in the parking lot of the Inn in Lancaster, consistent with Trooper Velez's statements. Further, Agent Clites saw Gould first hand in Lancaster at 1:30 a.m. That observation, coupled with Agent Clites' knowledge that (1) Gould's approved residence was in Harrisburg, (2) Agent Mann had previously cited Gould for staying overnight in Lancaster without authorization, and (3) Trooper Velez had stated that Gould had been at the Inn the day before, gave Agent Clites good reason to suspect that Gould was in violation of the terms of his parole. He therefore possessed the authority to stop Gould and investigate.
His subsequent searches of Gould and the Nissan were also proper. Agent Clites smelled the odor of marijuana emanating from the car when Gould exited the vehicle. This fact, and all of the other information that Agent Clites possessed, supported the trial court's determination that Agent Clites had reasonable suspicion to search Gould and his vehicle for signs of drug activity. See Smith , 85 A.3d at 537. As the suppression judge aptly stated:
I'll tell you this, I don't see anything inappropriate about Agent Clites' approach to this in terms of determining whether Mr. Gould is in violation of his supervision or not.
I mean, he gets information from a trooper that I believe he's entitled to reasonably rely upon, that indicates that maybe your client is involved in drug activity. But at the very least, he's down here in Lancaster County.
He comes down. He doesn't see anything. He comes back the next night. Lo and behold, your client shows up at a hotel parking lot at a very odd hour of the day for somebody who is just coming to visit Lancaster County and then turning around and going home would be here.
He's not with his girlfriend, he's not with anybody else. He's in the parking lot of the Westfield hotel at 1:30 in the morning.
Now, where is there anything unreasonable about Agent Clites' actions in light of what he has available to him at that point in this?
...
[W]hat he's doing is an investigation.
*938 I mean, there's a lot of questionable stuff going on here, and that's what we expect agents, parole officers, to do when red flags start going up about what one of these supervisees is really doing, and I think there's a lot of them here. That's the way I see it.
N.T., 5/17/16, at 52-54.
We affirm the trial court's conclusion that Agent Clites had reasonable suspicion to search Gould and his vehicle.
Stalking Horse Doctrine
Even where a parole officer has reasonable suspicion to search, "Pennsylvania courts historically invalidated probation officers' searches and subsequent seizures of evidence where the probation officers essentially 'switched hats,' and, in all relevant respects, became police officers." Commonwealth v. Parker , 152 A.3d 309, 320 (Pa.Super. 2016). This is referred to as the "stalking horse" doctrine. Id. The rationale behind the rule is to prevent a parole officer from aiding the police "by statutorily circumventing the warrant requirement, based on reasonable suspicion, instead of the heightened standard of probable cause." Id. In determining which "hat" the parole agent is wearing, the determinative element is the purpose of the search. Commonwealth v. Brown , 240 Pa.Super. 190, 361 A.2d 846, 850 (1976).
We find a review of cases that apply the doctrine instructive. In Brown , a parole agent received a non-anonymous tip that the parolee had stolen goods in his home. 361 A.2d at 848. The parole agent made a routine visit to the parolee's residence, and discovered (in plain view) a television set and stereo system. Id. The Agent then obtained a specific description of the items which had recently been stolen from the parolee's employer, and asked the employer if he wanted to press charges. Id. Rather than obtain a warrant, the parole agent brought the parolee's employer (to identify the items) and two police officers on a second visit to the parolee's home. Id. Under these facts, we determined that the parole agent had "switched hats," "ceased acting as an administrator of the parole system," and was instead "acting as a police officer, involving a witness who wanted to press criminal charges and other police officers." Id. at 850. We held that the stalking horse doctrine applied, and that the burgled items were inadmissible in criminal charges against the parolee.
In contrast, in Altadonna , we determined that the doctrine did not apply. In that case, parole officers received information from a parolee that another parolee was selling drugs and carrying a handgun. 817 A.2d at 1147. The agents arranged for the informant parolee to lure the second parolee to meet for a drug buy, and contacted agents from the Bureau of Narcotics Investigation of the Attorney General's Office ("BNI"), who provided backup, vehicles, and advice. Id. at 1147-48. When the second parolee arrived, he was arrested, and his van was searched for drugs. Because the court credited the testimony that the sting was designed to determine whether the parolee had committed a technical violation of his parole, we held that the parole officers were not acting as agents of the BNI. Id. at 1153.
Similarly, in Parker , probation officers went to a probationer's residence to determine if the probationer was complying with the terms of probation.[10] 152 A.3d at 312. Upon entry at the residence, probation officers observed drug paraphernalia, a shotgun, ammunition, and prohibited *939 knives in plain view. Despite having ample evidence of technical probation violations, the probation officers suspected that the probationer had additional contraband that should be removed from the home prior to the probationer's return after his arrest. The probation officers called the Lancaster County Drug Task Force ("DTF"), but DTF agents decided not to press charges or seek a warrant, and left. The probation officers then searched the residence and found cocaine in a refrigerator. They again called the DTF agents, who returned, saw the cocaine, and this time filed drug charges against the probationer. We rejected the probationer's "stalking horse" claim because the record lacked evidence of any express or tacit agreement between the probation officers and the DTF. Id. at 323.[11]
The instant record is likewise devoid of facts supporting Gould's argument that Agent Clites was acting at the behest of the police. Agent Clites testified that Trooper Velez did not give him any instructions to detain, search, or arrest Gould. Rather, Agent Clites' interactions with Gould were designed to determine whether Gould was violating the terms of his parole-specifically, whether Gould possessed drugs or was staying at an unapproved residence. See Brown , 361 A.2d at 850 (stating purpose of parole agent's search is dispositive inquiry in "stalking horse" analysis). Agent Clites maintained that his investigation was separate from Trooper Velez's investigation, and no testimony or exhibits suggested that Agent Clites even had any contact with Trooper Velez on his return to the Inn on the evening of August 8 or early morning of August 9. The only indication that Agent Clites was still in communication with the state police that night was his testimony that state troopers were present "as backup" when Gould eventually arrived, and the trial court credited Agent Clites's testimony.
On this record, we are unable to conclude that Agent Clites was acting as a "stalking horse" for the state troopers, rather than in his capacity as a parole officer. We therefore we affirm the trial court's rejection of Gould's argument on this point as well.
II. Search by Police
In his second issue, Gould argues that the police search of his vehicle was unlawful because the warrant authorizing the search omitted "material facts," those facts being "that Agent Clites had detained [Gould], searched his vehicle without a warrant, and found suspected drugs in the vehicle." Gould's Br. at 14. Gould contends that the police based their reasonable suspicion to perform the dog sniff of the vehicle on the results of Agent Clites's search,[12] but that the police "omitted the information from the [affidavit] that led them to conduct a dog sniff[.]" Id. Gould asserts that because the dog sniff was based on the parole search, which, in his view, was illegal, neither could support the finding of probable cause required to validate the warrant. In other words, "[w]ithout the information regarding the drugs found in the car, there was no reasonable suspicion to support the dog sniff *940 search, and without the dog sniff search, there was no probable cause to issue the warrant." Id. at 14-15.
Gould conflates several legal principles. First, Gould appears to argue that to properly support its warrant application, the Commonwealth should have included not only the results of the dog sniff, but also information sufficient to legally justify the dog sniff. However, a magistrate does not review the affidavit for potential suppression issues. See Commonwealth v. James , 620 Pa. 465, 69 A.3d 180, 190 (2013) ("The magistrate is to evaluate probable cause, not anticipate or rule pre-search on any conceivable suppression issue counsel may later assert"). Gould does not argue that the affidavit, on its face, with the inclusion of the results of the dog sniff, was insufficient to establish probable cause. Therefore, Gould's argument, insofar as he challenges the issuance of the warrant based on a lack of probable cause within the four corners of the affidavit, lacks merit.
Second, Gould argues that the affidavit of probable cause was defective because it omitted material facts.[13] Where a defendant alleges that material facts were omitted from an affidavit, we consider "(1) whether the officer withheld a highly relevant fact within his knowledge, where any reasonable person would have known that this was the kind of thing the judge would wish to know" and "(2) whether the affidavit would have provided probable cause if it had contained a disclosure of the omitted information." Commonwealth v. Taylor , 850 A.2d 684, 689 (Pa.Super. 2004). This type of challenge typically applies where the omission of facts tended to mislead the magistrate as to the veracity of the facts included. The pertinent analysis is whether inclusion of the omitted material facts would have undermined the other facts in the affidavit that gave rise to probable cause. See id. (collecting cases). Under this analysis, Gould's argument is again misplaced-the omitted information does not render the included information misleading in any way.
The heart of Gould's argument is that the suppression court should have suppressed the fruits of the execution of the search warrant because the facts in the affidavit were based on an unconstitutional search. In this analysis, the suppression court was permitted to consider facts outside the warrant's four corners. See James , 69 A.3d at 190 (explaining that claim that defendant's "constitutional rights might have been violated during the accumulation of evidence used in the affidavit ... must be resolved with evidence beyond the affidavit's four corners.... The goal of this inquiry [is] not to determine probable cause; it [is] to determine whether a fact in the affidavit would be included or stricken when determining probable cause").
On this theory, Gould's argument again fails because, as discussed above, the search by Agent Clites was not unconstitutional. Moreover,
The law is clear that where some evidence contained in a search warrant affidavit is unlawfully obtained, we must consider whether the affidavit nonetheless sets forth probable cause in the absence of such evidence. In other words, we must decide whether, absent the information obtained through illegal activity, probable cause existed to issue the warrant. Only evidence that was available to police because of the unconstitutional *941 search, i.e. , the product of the illegal police activity, is disregarded.
Hernandez , 935 A.2d at 1283-84 (citations omitted).[14]
Here, even if Agent Clites's search was improper and the results subject to suppression, there was ample independent basis for issuance of the warrant. The affidavit recounts that two different confidential informants described in detail Gould's drug operation, including that he would typically use a rental vehicle and have a female employee rent a hotel room; that he would obtain large quantities of drugs, deliver them to the hotel room in his vehicle, would have them packaged for distribution in the hotel room, and would use the vehicle to pick up the packaged drugs. The informants identified the vehicle that Gould was currently driving, which was corroborated by Trooper Velez's surveillance of the hotel. The informants identified (by first name and photograph) the female employee Gould was using at the Westfield Inn, which was also corroborated by Trooper Velez's surveillance of the hotel. The informants identified the room in the hotel that Gould was using, and a search of that room uncovered drugs and drug packaging equipment. The affidavit therefore not only contained reasonable suspicion to support the dog sniff of Gould's vehicle, independent of Agent Clites's search, but probable cause to substantiate the affidavit, independent of the dog sniff.
We therefore hold that the trial court did not err in concluding that the warrant was supported by probable cause and that the results of the search of Gould's vehicle were admissible against him at trial. As we find no merit in either of Gould's issues, we affirm his judgment of sentence.
Judgment of sentence affirmed.

See 35 P.S. § 780-113(a)(30).

See Trial Court Opinion, filed October 25, 2017, at 5-6.

According to Gould's parole file, he was released from prison in 2012, and his parole was set to expire in 2017. See Gould's Ex. 1.

Trial testimony established that the car driven by Gould was a rental vehicle. We refer to it as "Gould's vehicle" for ease of understanding.

This was the evidence admitted against Gould under CP-36-CR-0005383-2015, which is not before us on appeal.

35 P.S. § 780-113(a)(30), (a)(32), and 18 Pa.C.S.A. § 903(a)(1), respectively.

Gould raised two other issues in his Pa.R.A.P. 1925(b) statement, but made no argument related to those issues in his appellate brief, and has thus abandoned them. We therefore do not address them.

The statute also requires that, absent exigent circumstances, a parole agent must obtain prior approval from a supervisor to conduct a property search. 61 Pa.C.S.A. § 6153(d)(3). However, a violation of the statute alone will not constitute grounds for suppression of evidence. Id. at (c).

Cf. Commonwealth v. Au , 615 Pa. 330, 42 A.3d 1002, 1008 (2012) (concluding no investigative detention occurred where officer approached vehicle parked in lot, but did not activate overhead lights, position his vehicle so as to block suspect vehicle from leaving, or otherwise issue threats or commands or show force); Commonwealth v. Baldwin , 147 A.3d 1200, 1204 (Pa.Super. 2016) (finding no investigative detention where officers' vehicle did not block pedestrian's path out of parking lot); Commonwealth v. Collins , 950 A.2d 1041, 1044, 1047 (Pa.Super. 2008) (en banc ) (finding no investigative detention where police parked 20 feet behind vehicle parked along highway, did not block vehicle from leaving, and did not activate overhead lights).

The Fourth Amendment rights of probationers and parolees are "virtually indistinguishable." See Commonwealth v. Parker , 152 A.3d 309, 316 (2016).

See also Commonwealth v. Crisp , 441 Pa.Super. 171, 657 A.2d 5, 7 (1995) (probation agent who brought two police officers to search probationer's residence was not acting as "stalking horse," where probation agent testified that he asked police to accompany him for protection, and police were outside their geographical jurisdiction).

Reasonable suspicion will support a warrantless canine sniff of the exterior of a vehicle. See Commonwealth v. Hernandez , 594 Pa. 319, 935 A.2d 1275, 1285 (2007).

Gould repeatedly framed his argument as "omission" at the suppression hearing and in his Rule 1925(b) statement.

See also Commonwealth v. Lloyd , 948 A.2d 875, 880 (Pa.Super. 2008) ("The 'independent source doctrine' springs from the need to balance illegal police conduct against the need for juries to receive all probative evidence and permits the introduction of evidence at trial that was procured initially by illegal police conduct but is, nevertheless, supported by probable cause, independent of the misconduct, that is sufficient to support the issuance of a search warrant").