J-S09039-23

2024 PA Super 51

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| EMIRE SALEM ROSENDARY | : | |
| | : | |
| Appellant | : | No. 207 WDA 2022 |

Appeal from the Judgment of Sentence Entered December 13, 2021
In the Court of Common Pleas of Erie County
Criminal Division at No(s):  CP-25-CR-0000932-2020

BEFORE:  BENDER, P.J.E., BOWES, J., and SULLIVAN, J.

OPINION BY SULLIVAN, J.:                    **FILED March 19, 2024**

Emire Salem Rosendary ("Rosendary") appeals from the judgment of sentence entered following his jury convictions for one count each of robbery, aggravated assault, terroristic threats, possessing an instrument of crime, and reckless endangerment.[1]  After careful review, we affirm.

Because of the posture of this case, we need not detail the underlying facts of the crime.  We briefly note, on March 19, 2020, Rosendary entered the vehicle of his victim, lay in wait for him for nearly two hours, robbed him at gunpoint, and then physically assaulted him.  **See** Trial Court Opinion, 5/11/22, at 3-6.  At the time of the March 2020 robbery, Rosendary had been on parole for less than six months from a prior robbery conviction.  **See id**. at 3.  Rosendary was on electronic monitoring ("EM") and was wearing a GPS

---

[1] 18 Pa.C.S.A. §§ 3701(a)(1), 2702(a)(1), 2706(a)(1), 907(b), and 2705.

ankle monitor ("GPS") when he committed the March 2020 robbery. After his apprehension and prior to trial, Rosendary filed a motion to suppress. Following an evidentiary hearing, the suppression court denied the motion, and made the following findings of fact:

1. [Rosendary] was on parole and under the supervision of Pennsylvania Board of Probation and Parole Agent Beth Ann Servidio [("Agent Servidio")] beginning in October of 2019 and continuing through March of 2020.

2. At the time of his initial release, [Rosendary] was placed on a GPS . . . for 45 days as a special condition of his parole.

3. The [first GPS] was removed in mid-December 2019.

4. In . . . January of 2020, [Rosendary was] charged with new crimes . . . .

5. The imposition of new criminal charges while on supervision is a serious noncompliance with parole conditions which requires a serious sanction such as monitoring by [GPS].

6. [Because] of the new charges, [Rosendary] was placed on [GPS] for a second time[.]

7. [] Parole Agent Servidio reviewed the [GPS] Special Condition contract (GPS Contract) with [Rosendary], and he signed the [GPS] contract that same day.

8. By signing the GPS Contract, [Rosendary] acknowledged in writing that he understood he was required to wear the GPS . . . 24 hours a day and was not permitted to remove or otherwise tamper with [it].

9. [Rosendary] was required to be in his approved residence from 9:00 p.m. to 5:00 a.m. daily.

10. At the evidentiary hearing . . . [Rosendary] acknowledged reviewing and signing the GPS Contract.

11.    [Rosendary] also testified at the hearing that he knew he would be required to wear the GPS . . . 24 hours a day.

12.    As part of her duties in supervising [Rosendary] while on [GPS] and pursuant to department policy, Agent Servidio was required to review [Rosendary's] GPS movements at least once a week.

13.    On or about March 23, 2020, Detective Patrick Ginkel [("Detective Ginkel")] of the Erie Police Department contacted Agent Servidio and asked if she was supervising [Rosendary] and if he was on [GPS].

14.    Detective Ginkel informed Agent Servidio that [Rosendary] was a suspect in an armed robbery.

15.    Agent Servidio asked Detective Ginkel where and when the alleged crime had occurred.

16.    Agent Servidio reviewed [Rosendary's] GPS information for that date and time.

17.    Agent Servidio turned over screen[]shots of [Rosendary's] GPS movements to Detective Ginkel.

18.    Detective Ginkel did not have a warrant for [Rosendary's] GPS information.

Suppression Court Order, 10/1/21, at 1-3 (unnumbered) (citations to the record omitted).

A jury convicted Rosendary of the above-cited offenses. The trial court sentenced Rosendary to an aggregate term of twenty and one-half to fifty-two years in prison. Rosendary filed a post-sentence motion, which the trial court denied. The instant, timely appeal followed.[2]

---

[2] Rosendary and the trial court complied with Pa.R.A.P. 1925.

- 3 -

Rosendary raises a single issue on appeal:

Whether the [suppression] court err[ed] in failing to suppress the evidence which was illegally obtained when the police utilized [Rosendary's] state parole agent as a '22 stalking horse' in order to circumvent the requirement of a search warrant?

Rosendary's Brief at 3 (capitalization regularized).

Rosendary challenges the denial of his motion to suppress the GPS location data from his EM. *See* Rosendary's Brief at 12-18. The issue of whether police are required to obtain a warrant prior to obtaining GPS location data from a parole agent is a matter of first impression. We begin by recognizing that our standard of review over the denial of a motion to suppress:

is limited to determining whether the findings of fact are supported by the record and whether the legal conclusions drawn from those facts are in error. In making this determination, this Court may only consider the evidence of the Commonwealth's witnesses, and so much of the witnesses for the defendant, as fairly read in the context of the record as a whole, which remains uncontradicted. If the evidence supports the findings of the trial court, we are bound by such findings and may reverse only if the legal conclusions drawn therefrom are erroneous.

*Commonwealth v. Gindraw*, 297 A.3d 848, 851 (Pa. Super. 2023) (citation omitted, bracket removed). Further, our review is limited to the suppression hearing record. *In re L.J.*, 79 A.3d 1073, 1085 (Pa. 2013). "With respect to a suppression court's factual findings, it is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court

judge is entitled to believe all, part or none of the evidence presented." ***Commonwealth v. Heidelberg***, 267 A.3d 492, 499 (Pa. Super. 2021) (citation and internal quotation marks omitted). Lastly, when a defendant files a suppression motion, he has "the preliminary burden of establishing standing and a legitimate expectation of privacy." ***Commonwealth v. Burton***, 973 A.2d 428, 435 (Pa. Super. 2009) (*en banc*).

Both the Fourth Amendment of the Constitution of the United States and Article 1, Section 8 of the Constitution of the Commonwealth of Pennsylvania protect citizens from unreasonable searches and seizures. The Fourth Amendment provides:

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.

> Similarly, the Pennsylvania constitution provides:

> [t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. Art. I, § 8.[3]

> With respect to the rights of parolees, this Court has explained:
>
> [t]he aim of probation and parole is to rehabilitate and reintegrate a lawbreaker into society as a law-abiding citizen. The institution of probation and parole assumes a probationer or parolee is more likely than the ordinary citizen to violate the law. **Consequently, probationers and parolees have limited Fourth Amendment rights because of a diminished expectation of privacy**.

*Commonwealth v. Parker*, 152 A.3d 309, 316 (Pa. Super. 2016) (citations omitted, emphasis added); *see also Samson v. California*, 547 U.S. 843, 852 (2006) (parolees have a "severely diminished expectation [] of privacy"). Moreover, law enforcement "has an 'overwhelming interest' in supervising parolees because parolees . . . are more likely to commit future criminal offenses." *Id*. at 853 (citation omitted); *see also Parker*, 152 A.3d at 316. Nevertheless, while probationers and parolees have "a more narrowly protected privacy interest than that afforded a free individual . . . the government's interest in enforcing the terms of parole and probation cannot

_____

[3] In the argument section of his brief, Rosendary does not set forth a separate analysis of whether the Pennsylvania constitution provided him with greater protection than the federal constitution. **See** Rosendary's Brief at 12-18. To assert a claim that Article I § 8 provides greater protection than its federal counterpart, the Pennsylvania Supreme Court in **Commonwealth v. Edmunds**, 586 A.2d 887, 895 (Pa. 1991), directed a party must brief and analyze at least the four factors set forth in that decision. Since Rosendary did not undertake this separate analysis in his brief, we consider his claim solely under the Fourth Amendment and its relevant case law.

entirely displace a parolee's protected privacy rights." ***Commonwealth v. Arter***, 151 A.3d 149, 167 (Pa. 2016) (citation omitted).

The Pennsylvania Supreme Court summarized state parole agents' authority and duties with respect to parolees as follows:

> state parole agents' authority and duties with respect to parolees are prescribed by two sections of the Prisons and Parole Code. Section 6152 [(repealed)[4]] declares agents to be peace officers and provides them with police power to arrest without warrant any parolee under supervision for violating parole conditions. ***See*** 61 Pa.C.S.[A.] § 6152 [(repealed)]. Section 6153 [(repealed)] deems parole agents to be in a "supervisory relationship with their offenders," aimed at assisting parolees in rehabilitation and reassimilation and protecting the public. ***Id***. § 6153(a) [(repealed)]. This section further outlines the procedures and requirements for agents to search the person and property of offenders . . . and provides that such searches must comport with the protections of the United States and Pennsylvania Constitutions. . . . . Another provision prevents the exclusion of evidence from parole or criminal proceedings based solely on a violation of the statute.

***Commonwealth v. Mathis***, 173 A.3d 699, 701–02 (Pa. 2017) (footnote and some statutory citations omitted; footnote added).

Rosendary argues the trial court erred in denying his suppression motion. Specifically, he argues he "maintained a legitimate expectation of privacy in the record of his physical movements." Rosendary's Brief at 10. He further avers Agent Servidio became a "stalking horse" for the police by

_____

[4] 61 Pa.C.S.A. §§ 6152 and 6153, in effect at the time of the March 2020 robbery, were repealed and replaced by 61 Pa.C.S.A. §§ 6181 and 6182. The former and current statutes are materially identical as applied to this case.

acting at their behest and searching his GPS movements. *See id*. at 10-11. Rosendary concludes the police violated his rights under the United States and Pennsylvania Constitutions by not obtaining a search warrant. *See id*. at 11. Rosendary relies on the United States Supreme Court's decisions in **United States v. Jones**, 565 U.S. 400 (2012) and **Carpenter v. U.S.**, 585 U.S. 296 (2018). **See** Rosendary's Brief at 12. Rosendary claims he had a "legitimate expectation of privacy in the record of his physical movements." *See id*. at 13. He maintains "the tracking of an individual's physical movements provides an intimate window into a person's life revealing not only particular movements but through those movements, familiar, political, professional, religious, and sexual associations." *Id*.

The suppression court noted Rosendary agreed to GPS monitoring after he violated his parole by incurring new criminal charges. **See** Suppression Court Order, 10/1/21, at 2 (unnumbered); N.T., 9/30/21, at 8-9; EM – Special Conditions Contract, 2/5/20, at 1 (unnumbered). The court found Rosendary, "testified . . . under oath that he was aware that his travels outside the home would be monitored by parole." Suppression Court Order, 10/1/21, at 4 (unnumbered).[5] The suppression court thus determined Rosendary had a

---

[5] While acknowledging parolees had a "reduced" expectation of privacy, the suppression court nonetheless concluded as a threshold matter that Rosendary had a "reasonable" expectation of privacy in his EM data and analyzed his Fourth Amendment claims under that standard. Suppression
*(Footnote Continued Next Page)*

"reduced" expectation of privacy. *Id*. at 3 (unnumbered). It further held once Agent Servidio was "on notice" Rosendary was being investigated for a crime it was "reasonable for her to believe [Rosendary] was . . . in violation of his parole." *Id*. at 4. The court concluded it was also "reasonable for Agent Servidio to provide the GPS tracking data to [Detective Ginkel]." *Id*.

The record supports the suppression court's ruling. Agent Servidio placed Rosendary on GPS monitoring, not at the behest of the police, but as an alternative to incarceration favorable to **Rosendary** even after he was charged with committing new crimes, which constituted a "high-level [parole] violation(s)". *See* N.T., 9/30/21, at 8. The record shows Rosendary signed a contract stating he was required to "wear the GPS Device 24 hours a day for the duration of GPS Monitoring." EM — Special Conditions Contract, 2/5/20, at 1 (unnumbered).[6] Further, at the suppression hearing, Rosendary agreed

_____

Court Order, 10/1/21, at 3 (unnumbered). This Court does not agree, and, thus, our reasoning differs from that of the trial court. However, we may affirm on different grounds than those enunciated by the trial court. *See Commonwealth v. Lehman*, 275 A.3d 513, 520 n.5 (Pa. Super. 2022) (stating it is well-settled where the result is correct, we may affirm a lower court's decision on any ground whether relied upon by that court); *Commonwealth v. Elliott*, 249 A.3d 1190, 1193 n. 3 (Pa. Super. 2021), ("It is well-settled that this Court may affirm the decision of the [trial] [c]ourt if it is correct on any basis") (citations and internal quotation marks omitted).

[6] We note the signed agreement provided a process by which Rosendary could file a written complaint if he believed the GPS monitoring was "inappropriate." EM — Special Conditions Contract, 2/5/20, at 1 (unnumbered). There is nothing of record to indicate Rosendary ever did so.

this was his second time on GPS monitoring, less than six months after release. He admitted he signed the contract, and Agent Servidio explained everything to him. **See** N.T., 9/30/21, at 29. Thus, Rosendary understood the purpose of the GPS monitoring was to keep track of what he was doing in the community and to prevent him from committing further crimes. **See id**. at 9. Rosendary acknowledged he was required to wear the GPS twenty-four hours a day and would "get in trouble" if he removed the device. **Id**. at 30. He understood the device was "basically a tracker[.]" **Id**. Rosendary consented to the tracking of his movements, did not complain the conditions were inappropriate, and he did not have an expectation of privacy in the monitoring data. As the suppression court found, regulations required Agent Servidio to monitor Rosendary's whereabouts twenty-four hours a day, seven days a week, and review Rosendary's GPS tracking points at a **minimum** of once per week. **See** N.T., 9/30/21, at 6-7. Agent Servidio stated when Detective Ginkel informed her Rosendary was a suspect[7] in armed robbery, a second and potentially serious parole violation, she questioned Detective Ginkel about when the robbery occurred, then went into the system and

_____

[7] While Agent Servidio did not testify as to why Rosendary was a suspect, her testimony makes clear Detective Ginkel was not engaged in a fishing expedition but was already in possession of information which pointed to Rosendary as the perpetrator and Detective Ginkel sought only data **to confirm Rosendary's presence at the scene of the robbery or exculpate him**.

looked up Rosendary's location on that day. ***See id***. at 13. Agent Servidio then told Detective Ginkel "what I was seeing on the screen during ***that time frame***"[8] and complied with his request for "screenshots" for that specific time period. ***Id***. at 14 (emphasis added). Agent Servidio stated it was the parole unit's/office's policy "to cooperate with law enforcement agencies whenever trying to identify, apprehend, or detain offenders who are suspected of or involved in criminal activity." ***Id***. at 13.

Here, Agent Servidio had a legitimate reason to search Rosendary's GPS location data for that date and time and provide that limited information to police to use, confirm or rebut Rosendary's presence at the scene of the robbery. Any intrusion the disclosure of Rosendary's location at the time of the crime caused was narrow and focused. Further, the data had limited

---

[8] Rosendary takes issue with Agent Servidio's testimony that she volunteered the information to Detective Ginkel. ***See*** Rosendary's Brief at 15-17. The record reveals although Detective Ginkel was present at the suppression hearing, neither party called him as a witness. ***See*** N.T., 9/30/23, at 25-26. In his brief, Rosendary relies on Joint Exhibit B, which consists of an extract of page 25 of a 126-page Erie Police Department Field Case "Supplemental Report." The portion is not signed nor sworn. ***See*** Supplemental Report, 3/26/20 at 25. Of pertinence, Detective Ginkel, who is listed as the "reporting officer" states "I requested Agent Servidio examine [Rosendary's] electronic monitoring records . . . Agent Servidio supplied me with screen shot images on [*sic* Rosendary's] location[.]" ***Id***. The suppression court chose to credit the sworn testimony of Agent Servidio over the out-of-court unsworn extract of a report from Detective Ginkel. ***See*** Suppression Court Opinion, 10/1/21, at 5 (unnumbered). We have no basis to disturb this credibility finding. ***See*** ***Heidelberg***, 267 A.3d at 499.

privacy implications: it simply showed Rosendary's travels on public streets and revealed nothing about his activities. **See** Trial Court Opinion, 5/11/22, at 3-4.

On similar facts, the Supreme Judicial Court of Massachusetts rejected the argument Rosendary advances concerning a parolee's right of privacy in GPS data. In **Commonwealth v. Johnson**, 119 N.E.3d 669 (Mass. 2019),[9] Johnson violated probation and asked to be placed on an ankle monitor *in lieu* of incarceration. **See id**. at 674-75. Following the expiration of his probation, the police arrested Johnson at the scene of a break-in. **See id**. at 675, 681. The police suspected Johnson had been involved in a series of break-ins while on probation. They contacted the probation department and asked them to review Johnson's historical GPS data at the dates and times of the robberies. **See id**. Probation services later shared, without a warrant, GPS data location showing Johnson had been at the scene of the break-ins. **See id**. In upholding the denial of suppression, the **Johnson** Court held the police and probation services had statutory duty as a matter of Massachusetts law to share information, and Johnson had no reasonable expectation of privacy in the GPS data. **See id**. at 682. The Court explained,

> [t]he defendant here was of course not just on probation; he was on probation with the added condition of GPS monitoring

---

[9] "This Court may cite to the decisions of other states for persuasive authority." **Commonwealth v. Fortune**, 302 A.3d 780, 787 n. 3 (Pa. Super. 2023) (citation omitted).

because he had stipulated to violating his original sentence of probation after he was charged with breaking and entering and larceny while on probation. The defendant was thus on notice that GPS monitoring was imposed as a result of the defendant's criminal activity while on probation and the judge's concern over the defendant's demonstrated risk of recidivism. Any such defendant-probationer would therefore objectively understand that his or her person and movements were being recorded by the GPS device and monitored by the Commonwealth to ensure compliance with probationary conditions and to deter him or her from committing future crimes while wearing the GPS device. This understanding further diminished any objective expectation of privacy he might have had in his whereabouts, at least during the probationary period.

*Id*. at 682 (citation omitted).

The Court also focused on the extremely limited nature of the intrusion,

stating:

[t]he record does not describe law enforcement engaged in an effort to map out and analyze all of the defendant's movements over the six-month probationary period. . . . Rather, . . . the Commonwealth reviewed the defendant's historical GPS location data to determine whether he was present at the general times and locations when various unsolved break-ins may have occurred. . . . . [T]he GPS location data actually accessed and reviewed by the Commonwealth was targeted to the task at hand. **Simply comparing subsets of the defendant's GPS location data recorded while he was on probation to the general times and places of suspected criminal activity during the probationary period is not a search in the constitutional sense**.

\* \* \* \* \*

We also understand that even a targeted review of GPS data directed at times and locations of suspected criminal activity during a probationary period will likely expose the police to some other information concerning the defendant's whereabouts during the relevant time periods. This is, however, quite different from either mapping out and reviewing all of the defendant's

movements while on probation or rummaging through the defendant's historical GPS location data indiscriminately. **So long as the review is targeted at identifying the defendant's presence at the time and location of particular criminal activity during the probationary period, it is not a search, as such review is consistent with a probationer's limited expectations of privacy.** Police action necessary to deter and detect criminal activity during the probationary period is reasonably expected.

*Id*. at 684-85 (citations and footnote omitted; emphases added).[10]

Here, as in **Johnson**, Rosendary chose to be placed on EM as an alternative to incarceration after he committed serious parole violations.

---

[10] As noted above, this is a matter of first impression. We have uncovered few cases, either published or unpublished in either federal court or in our sister states, addressing this issue. However, in unpublished decisions, federal courts have agreed with our conclusion that a parolee has a severely diminished expectation of privacy in GPS location data. **See United States v. Lenhart**, 2023 WL 5524851, at *2 (6th Cir., 8/23/23) (affirming district court's denial of appellant's motion to suppress real-time location data regarding the location of a car being used by a fugitive parolee subject to electronic monitoring and holding "a parolee who was subject to electronic monitoring as a condition of his parole[] had no reasonable or legitimate expectation of privacy in his location"); **United States v. Gaines**, 2021 WL 4263375, at **7-8 (D. Conn., 9/20/21) (denying defendant's motion to suppress GPS location data gathered by parole agent and shared, without a warrant, with police as part of an investigation into defendant's participation in a conspiracy to commit murder because as a parolee, defendant had "a substantially diminished expectation of privacy in his location at any given time"); **Mackey v. Hanson**, 2019 WL 5894306, at **4-6 (D. Colo., 11/12/19) (denying *habeas corpus* relief and rejecting defendant's Fourth Amendment challenge to suppress GPS location data turned over from pre-trial monitoring services to the police where the Colorado Court of Appeals made a "colorable application of the correct Fourth Amendment standard" in holding the defendant "did not have a legitimate expectation of privacy in the GPS data collected by the ankle monitor he agreed to wear as a condition of his pretrial release in another case.").

Rosendary was thus on notice that the parole system received information about his locations twenty-four hours a day to ensure he did not engage in further prohibited activity. Agent Servidio had a legitimate reason to search Rosendary's GPS location data for the date and time of the robbery and provide that limited information to police. It was reasonable for the police to receive Rosendary's GPS location data to confirm **or rebut** his presence at the scene of the robbery. Further, any intrusion in the disclosure of Rosendary's location at the time of the crime was brief and targeted. The data simply showed Rosendary's travels on public streets and showed nothing about his activities at these locations. **See** Trial Court Opinion, 5/11/22, at 3-4.

We take instruction from this Court's decision in **Commonwealth v. Dunkins**, 229 A.3d 622 (Pa. Super. 2020), **affirmed**, 263 A.3d 247 (Pa. 2021), **cert. denied**, --- U.S. ---, 142 S.Ct. 1679 (2022). In **Dunkins**, campus police at Moravian College ("college") who were investigating an on-campus robbery by two men, requested that the Director of Systems Engineering access the college's Wi-Fi network to compile a list of students logged into the nearest Wi-Fi access point to the robbery. **See Dunkins**, 263 A.3d at 625. They discovered, at the time of the robbery, Dunkins was the only male non-resident of the dorm logged into the network at that location. **See id**. The campus police provided this information to the local police department. **See id**. at 625-26. In affirming the trial court's denial of suppression, this Court highlighted that Dunkins consented to the college's

collection and dissemination of cell site location information ("CSLI") by signing and accepting the college's internet policy, which allowed it to collect internet data. *See id*. at 629-30.

Rosendary knowingly and voluntarily consented to have his movements monitored by a third party in exchange for the benefit of avoiding incarceration. The GPS data at issue here and CSLI data at issue in *Dunkins* are similar. Rosendary was on parole, consented to have his movements monitored, and he lost any expectation of privacy in those movements when he knowingly and voluntarily signed the GPS contract. *See id*.

Moreover, we find Rosendary's reliance on *Jones*, *supra* and *Carpenter*, *supra* misplaced.[11] Neither *Jones* nor *Carpenter* involved an individual on parole who *consented* to share his location data with the government as an alternative to incarceration after he violated parole.

_____

[11] In *Jones*, the police, acting without a warrant, installed a GPS tracker on a suspect's car. *See Jones*, 565 U.S. at 402-03. The United States Supreme Court held this constituted a search within the meaning of the Fourth Amendment. *See id*. at 404. The Court summarized what took place as "[t]he Government physically occupy[ing] private property for the purpose of obtaining information." *Id*. In *Carpenter*, the government obtained, without a warrant, CSLI from several wireless carriers to track the long-term movements of a suspect in multiple robberies. *Carpenter*, 585 U.S. at 301-03. The Supreme Court held that, because of the "the unique nature of cell phone location records," an individual "maintains a legitimate expectation of privacy in the record of his physical movements as captured through [CSLI]," and, accordingly, CSLI obtained from Carpenter's wireless carriers was the product of a search. *Id*. at 2217 (footnote omitted).

Moreover, Detective Ginkel did not request Agent Servidio turn over the volumes of data collected in both *Jones* and *Carpenter* but rather asked for screenshots following her independent decision to review Rosendary's GPS data; and this request was limited to a particular time on a single date while Rosendary, *whom he already suspected of involvement with the robbery*, was traveling on public streets. *See Jones*, 565 U.S. at 403; *Carpenter*, 585 U.S. at 301-02. Furthermore, it is well settled law that a person has no legitimate expectation of privacy in their movements on public streets. *See U.S. v. Knotts*, 460 U.S. 276, 281 (1983).

Thus, for the reasons discussed above, the findings of fact are supported by the record, and the suppression court did not err in denying Rosendary's motion to suppress. *See id*. at 281; *Dunkins*, 263 A.3d at 255-56; *Johnson*, 119 N..E.3d at 682-85.

Moreover, even if Rosendary had a legitimate expectation of privacy in his GPS data, and Agent Servidio's action in turning the information over to the police constituted a warrantless search, Rosendary would nevertheless be due no relief because the record clearly demonstrates the search was reasonable. The statute in place at the time of the March 2020 robbery allowing a search by a parole officer provides, in relevant part:

**(b) Searches and seizures authorized.**—

(1) Agents may search the person and property of offenders in accordance with the provisions of this section.

(2) Nothing in this section shall be construed to permit searches or seizures in violation of the Constitution of the United States or section 8 of Article I of the Constitution of Pennsylvania.

* * * * *

**(d) Grounds for personal search of offender.**—

(1) A personal search of an offender may be conducted by an agent:

(i) if there is a reasonable suspicion to believe that the offender possesses contraband or other evidence of violations of the conditions of supervision[.]

* * * * *

(6) The existence of reasonable suspicion to search shall be determined in accordance with constitutional search and seizure provisions as applied by judicial decision. In accordance with such case law, the following factors, where applicable, may be taken into account:

(i) The observations of agents.

(ii) Information provided by others.

(iii) The activities of the offender.

(iv) Information provided by the offender.

(v) The experience of agents with the offender.

(vi) The experience of agents in similar circumstances.

(vii) The prior criminal and supervisory history of the offender.

(viii) The need to verify compliance with the conditions of supervision.

61 Pa.C.S.A. § 6153(b), (d) (repealed).

We have stated, "parolees agree to 'endure warrantless searches' based only on reasonable suspicion in exchange for their early release from prison." **Commonwealth v. Curry**, 900 A.2d 390, 394 (Pa. Super. 2006) (citation omitted). Thus, "agents need not have probable cause to search a parolee or his property; instead, reasonable suspicion is sufficient to authorize a search." **Id**. A search will be deemed reasonable "if the totality of the evidence demonstrates: (1) that the parole officer had a reasonable suspicion that the parolee had committed a parole violation, and (2) that the search was reasonably related to the parole officer's duty." **Commonwealth v. Gould**, 187 A.3d 927, 935 (Pa. Super. 2018) (citation omitted). Parole officers may form reasonable suspicion based on personal observations, their history with the parolee, the parolee's behavior while on parole, and **third-party information**. **See Commonwealth v. Colon**, 31 A.3d 309, 314–16 (Pa. Super. 2011).

Here, as noted above, Rosendary was on parole for armed robbery. Rosendary was placed on GPS monitoring because he violated his parole by allegedly committing additional crimes while on parole and he consented to GPS monitoring. Detective Ginkel, a reliable third party, informed Agent Servidio that Rosendary was a suspect in an armed robbery, the very same crime that led to Rosendary's placement on parole. Looking at the totality of the evidence, this was sufficient to allow Agent Servidio to search Rosendary's GPS location information for the day and time of the robbery and disseminate

the information to Detective Ginkel. *See Commonwealth v. Smith*, 302 A.3d 123, 127 (Pa. Super. 2023) (holding parole officer had reasonable suspicion for a warrantless search of parolee's residence where parolee had failed a drug test, his GPS showed visits to known drug spots, and parole agent received tips regarding parolee's drug activities); *Commonwealth v. Kuhlman*, 300 A.3d 460, 462, 468 (Pa. Super. 2023) (holding a probation officer had reasonable suspicion to search Kuhlman's computer where Kuhlman was on probation for computer-related crimes, the probation officer was aware Kuhlman had unmonitored internet access, Kuhlman's therapist expressed concerns about his lack of remorse, and Kuhlman had consented to warrantless searches of his person and home); *Gould*, 187 A.3d at 936-37 (holding parole agent had reasonable suspicion to detain defendant and search his person and vehicle, where police informed parole agent defendant was not residing at his designated residence, was seen in known drug spots, and parole agent had previously put defendant on notice for parole violations); 61 Pa.C.S.A. § 6153(b), (d) (repealed).

Lastly, Rosendary argues even if Agent Servidio had reasonable suspicion, she was acting as a "stalking horse" for the police. Rosendary's Brief at 13-18. "[P]ennsylvania courts historically invalidated probation officers' searches and subsequent seizures of evidence where the probation officers essentially 'switched hats,' and, in all relevant respects, became police officers." *Parker*, 152 A.3d at 320. This is referred to as the "stalking horse"

doctrine. *See id*. The rationale behind the rule is to prevent a parole officer from aiding the police "by statutorily circumventing the warrant requirement, based on reasonable suspicion, instead of the heightened standard of probable cause." *Id*. In determining which "hat" the parole agent is wearing, the determinative element is the purpose of the search. *See Commonwealth v. Brown*, 361 A.2d 846, 850 (Pa. Super. 1976).

We find *United States v. Lambus*, 897 F.3d 368 (2d Cir. 2018) elucidating.[12] There, the United States Court of Appeals for the Second Circuit held that a state parole agent who passed GPS monitoring data to police for several years as part of on-going state and federal investigations into Lambus's drug dealing did not violate the "stalking horse" doctrine. *See id*. at 402-12. The Second Circuit stated state parole officials had not become "mere conduits for federal law enforcement or that GPS monitoring . . . was continued at the behest of the federal agents." *Id*. at 406. The Court particularly noted it was the parole agent's decision, not that of federal authorities, to place and continue Lambus on GPS monitoring. *See id*. Ultimately, the Second Circuit concluded a parolee had a diminished expectation of privacy in his movements; GPS monitoring of the parolee was

_____

[12] "We recognize [federal court] decisions are not binding precedent on this Court. Nevertheless, we may consider federal court decisions, and opinions of other states, as persuasive authority." *Commonwealth v. Lang*, 275 A.3d 1072, 1083 (Pa. Super. 2022) (citations omitted).

reasonable, as was the turning over of the GPS monitoring location data to federal authorities. **Lambus**, 897 F.3d at 412.

Here, there is nothing in the record which supports Rosendary's claim that Agent Servidio was acting as a "stalking horse." Rosendary was not placed on GPS at Ginkel's (police) request. Rather, he was placed on GPS a second time for incurring new criminal charges, which is a parole violation. Nothing in the record indicated Agent Servidio regularly shared information with or contacted police. When contacted by the police and informed by them of her parolee's status as a suspect in yet another crime, Agent Servidio checked the GPS location data for a single date and time and shared that limited and relevant information with police. Moreover, Rosendary did not provide contradictory evidence of either an explicit or tacit agreement between Detective Ginkel and Agent Servidio for Agent Servidio to monitor Rosendary for the purpose of aiding a police investigation. **See supra** note 6. Thus, Rosendary has not demonstrated that Agent Servidio was acting as a "stalking horse." **See Lambus**, 897 F.3d at 412; **see also Gould**, 187 A.3d at 938-39 (rejecting "stalking horse" doctrine where, after being informed by police of defendant's suspected drug activities parole agent, with police as backup, detained and searched defendant for suspected parole violations); **Parker**, 152 A.3d at 323 (rejecting "stalking horse" doctrine where there was no

evidence of any express or tacit agreement between probation officers and police).[13]

As none of Rosendary's arguments merit relief, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 03/19/2024

_____

[13] Even if the trial court erred in denying Rosendary's suppression motion, he would be due no relief because the error is harmless.  Once a reviewing court has decided admitted evidence should have been suppressed, it must determine beyond a reasonable doubt whether the error was harmless. Where the error is harmless, a new trial is not warranted.  Our Supreme Court has explained that "[h]armless error exists if the reviewing court is convinced from the record that[, _inter alia_,] the erroneously admitted evidence was merely cumulative of other untainted evidence . . . ."  **Commonwealth v. Petroll**, 738 A.2d 993, 1005 (Pa. 1999).  Here, the GPS location monitoring data was merely confirmatory, and, thus, cumulative.  A private security camera at the location of the robbery showed Rosendary entering the victim's car and lying in wait for the victim for over two hours.  **See** Trial Court Opinion, 5/11/22, at 3.  Moreover, two Erie Police Department officers observed Rosendary in the vicinity immediately prior to the robbery and provided a detailed description of him; their description matched that of the individual seen on the security camera.  **See id**. at 5-6.  Accordingly, if the trial court's ruling were erroneous, it would be harmless.